IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**NAJIB MALIK,**
    Plaintiff,

FILED by _____ D.C.

AUG 30 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

v.                                    Case No. 14-23204-civ-LENARD

                                      Jury Trial: Yes  - Demanded

**DANIEL L. CONN, PRESIDENT AND CEO,**
**DR. DAVID J. REDDICK, REGIONAL MEDICAL DIRECTOR,**
**DR. SEYED HOSSEINI, CHIEF HEALTH OFFICER, S.F.R.C.,**
**DR. CARL BALMIR, CHIEF HEALTH OFFICER, E.C.I.,**
**DR. DORA GAXIOLA, CHIEF HEALTH OFFICER, E.C.I.,**
**MARIA LOUISSAINT, A.R.N.P., E.C.I.,**
**DR. OSCAR ORTEGA, MEDICAL DOCTOR, E.C.I.,**
    Defendants.

_____/


_____  *FINAL*  _____

**AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

2 5 2016

MN

## <u>TABLE OF CONTENTS</u>

I.  The Parties to This Complaint……………………………………….... 1

    A.  The Plaintiff(s)……………………………………………… 1

    B.  The Defendant(s)…………………………………………… 1

II.  Basis For Jurisdiction…………………………………………….....… 3

III.  Prisoner's status is that of a convicted and sentenced state prisoner…… 4

IV.  Statement of Claim…………………………………………………..... 4

    A.  Location where claim arose……………………………………… 4

    B.  Actions of Defendants in general……………………………… 4

        1.  CEO Conn………………………………….......……………… 5

        2.  Dr. David J. Reddick………………………………………….. 8

        3.  Dr. Hosseini, Dr. Balmir, Dr. Ortega, Dr. Gaxiola, and
            ARNP Louissaint……...………………………………...…… 11

    C.  <u>DATES AND FACTS</u>…………………………………………... 15

        a) <u>Daniel L. Conn, CEO</u>……………….…...................…… 15

            (COUNT I) Cost-Saving Policy…………………….....… 15

        b) <u>Dr. David J. Reddick</u>…………………………………… 21

            (COUNT II) Cost Saving Actions………………………… 21

        c) <u>Dr. Seyed Hosseini</u>……………………………….......… 30

            (COUNT III) Hepatitis-C………………………………… 33

        YEAR: <u>2010</u>………………………………………… 34

YEAR: **2011**...................................................................... 35

YEAR: **2012**...................................................................... 35

YEAR: **2013**...................................................................... 36

YEAR: **2014**...................................................................... 37

(COUNT IV) Neuropathy Pain and Suffering........... 42

d) Dr. Carl Balmir...................................................... 43

e) Dr. Oscar Ortega and Maria Louissaint, ARNP............. 45

f) Dr. Dora Gaxiola...................................................... 46

V.    Injuries................................................................... 47

VI.   Relief...................................................................... 47

VII.  Exhaustion of Administrative Remedies, Administrative Procedures.. 48

VIII. Previous Lawsuits................................................... 58

IX.   Certification and Closing......................................... 59

A. Plaintiff information................................................ 59

B. Unnotarized Oath................................................... 59

I.    **The Parties to This Complaint**

    C.    **The Plaintiff(s)**

> **Najib Malik**
> **X41699**
> **Santa Rosa Correctional Institution**
> **5850 East Milton Road**
> **Milton, Florida 32583-7914**

    D.    **The Defendant(s)**

**Defendant No. 1**

> **Daniel L. Conn**
> **President and CEO, Wexford Health**
> **Wexford Health Services, Inc.**
> **501 Holiday Drive**
> **Pittsburgh, PA 15220**
> **Ph: (412) 937-8590**

**Sued in his Supervisory capacity**

**Defendant No. 2**

> **David J. Reddick, Doctor**
> **Regional Medical Director (Region IV)**
> **Wexford Health Services, Inc.**
> **501 Holiday Drive**
> **Pittsburgh, PA 15220**
> **Ph: (412) 937-8590**

**Sued in his Individual capacity**

**Defendant No. 3**

> **Seyed Hosseini**
> **M.D., Chief Health Officer**
> **Anatomic & Clinical Pathology**
> **Jackson County Health Dept.**
> **4979 Healthy Way**
> **Marianna, Florida 32466**

**Sued in his Individual capacity**

1

**Defendant No. 4**

    **Carl Balmir**
    **M.D., Chief Health Officer**
C/o Armor Correctional Health Services,
555 SE 1st Avenue,
Ft. Lauderdale, Florida 33301
**Sued in his Individual capacity**

**Defendant No. 5**

    **Dora Gaxiola**
    **M.D., Chief Health Officer**
    **Florida Department of Corrections**
    **1599 SW 187th Avenue**
    **Miami, Florida 33194**
    **Ph: (305) 228-2000**
**Sued in her Individual capacity**

**Defendant No. 6**

    **Maria Louissaint**
    **Assigned Registered Nurse Practitioner**
    **170 E. Flamingo Road**
    **Pembroke Pines, Florida 33027**
    **Ph: (954) 431-1286**
**Sued in her Individual capacity**

**Defendant No. 7**

    **Oscar Ortega**
    **M.D.**
    **Florida Department of Corrections**
    **1599 SW 187th Avenue**
    **Miami, Florida 33194**
**Sued in his Individual capacity**

## II.     Basis For Jurisdiction

Under 42 USC § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [Federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue Federal officials for the violation of certain constitutional rights.

In the instant case, over 100 8th Amendment Federal Constitutional violations took place by seven defendants over a four year period of time, where the Defendants knew the substantial risk of harm that they put the Plaintiff in by their actions; ignored that knowledge and acted regardless of the danger; and the Plaintiff suffered extreme injury and pain.

A. The Plaintiff is bringing suit against state or local officials (a § 1983 claim)

B. Defendants deprived the Plaintiff of his USCA constitutional Eighth Amendment right to receive medical treatment for his serious medical needs. This right is guaranteed regardless of cost. The Defendants knew about Plaintiff's serious medical needs to be treated for Hepatitis-C, as well as Diabetic Neuropathy. They also knew that by their failure to adequately treat these serious medical needs, that they put the Plaintiff at an unnecessary risk of harm; and yet, they ignored that risk; and the Plaintiff needlessly suffered injury and pain. Any treatment received was so inadequate as to constitute

3

no treatment. The Defendants in essence caused Plaintiff Malik the federally forbidden cruel and unusual punishment for over four years by causing him to suffer severe to moderate pain almost daily for much of that time, unnecessarily in that adequate treatment was easily available that would have eliminated that pain.

C. All seven (7) Defendants were governmental entities, employees or officials working directly for Florida Department of Corrections, or as one of its agents; licensed by Florida; or a Supervisor of the same licensed by a State office. Each of the Defendants, under the scope of their employment acted under color of state or local law.

## III.   Prisoner's status is that of a convicted and sentenced state prisoner.

## IV.   Statement of Claim

A. The events of this claim arose at Everglades Correctional Institution. The case was ongoing and occurred between January 2010 through October 17, 2014.

B. Wexford Health Services, Inc., during the time period specified in this lawsuit, was operated by President and CEO, Daniel L. Conn. The company's rules and policies were the responsibility of Conn to change, implement, and/or condone in their existing state.

As its president, Conn was, in essence, Wexford, and vice versa. In this lawsuit, they each have the same connections to the unconstitutional violations

4

stated herein. Conn and Wexford are often named as the same entity, with each name equivalent to the other. The only thing this is untrue to, is: Conn being sued in his Supervisory capacity, not Wexford.

This 1983 lawsuit is based on:

**1)** The supervisory liability of **CEO Conn** in his Supervisory capacity, for implementing or condoning an already existing policy intended to save Wexford and D.O.C. money (a cost-saving policy) regardless of whether the methods used to save violate state prisoners' federal constitutional rights. In that President and CEO Conn was the principal for which all Wexford personnel were either employed or agents of, he knew that, in valuing their own individual jobs, as to being dismissed or reprimanded for noncompliance; his subordinates would act unlawfully, if necessary, to conform to Conn's Cost-Saving Policy; and Conn failed to stop them from doing so. Furthermore, CEO Conn encouraged his subordinates to do so, by implementing or authorizing a cost-saving reward aimed at rewarding subordinate medical participants a percentage of operating expenses saved, irregardless of whether the methods used to save operating costs were unlawful.

In the instance of Plaintiff Malik, the practice was so widespread during this period of time, throughout Wexford's contracted territory (Region IV), that one of his Defendants, Dr. Seyed Hosseini, saved Wexford and FDOC enough

5

money in 2012-2013 (3.9 million dollars) to rate public recognition on the internet, of his reward and personal achievement.

What is relevant to this event is that some of this earned reward, which was widespread throughout Wexford's medically operated prison structure, for many different participants (even Dr. Hosseini), was received using ill-gotten and unlawful methods to reduce cost of medical treatment and medication; injuring prisoners (such as Malik) in the process of saving. Especially in concern here, even though the issues were very widespread, are those medical staff that attended to the medical needs of Plaintiff Malik and other prisoners at Everglades C.I.

What also is relevant is the fact that President and CEO Conn knew or should have known the method entailed in the cost saving, but failed to stop any unlawful practice. The unlawful methods happened many times over, in the time frame of this lawsuit. It would be highly erroneous to think that a man, as powerful and knowing as CEO Conn (Wexford's president), would setup or condone a cost saving policy; encouraged by rewards to successful medical staff, that saved Wexford and D.O.C. operating expenses; that would then authorize a reward to a participant in the program, without a full disclosure of what took place to entitle the person to the payment received. CEO Conn knew of the unlawful practices of medical personnel, supervised by him or his

immediate subordinate (Dr. Reddick), to earn rewards, even though sometimes it was after the fact; and he could have easily put a stop to those practices, but he did not.

Not knowing, though, until after the fact is irrelevant. It is evident, in his life, that the CEO Conn is a very commanding individual, apparent by the office he holds at Wexford. It is also evident that in his position as President and CEO, Conn's authority is overshadowed by no one.

Therefore, finding unlawful practices used as a basis to save medical expenditures, after the fact of the unlawful methods used, still puts Conn at fault and liable for the unlawful conditions instilled by those practices. Even finding out those happenings after the fact, just one memo or one verbal order to make such methods cease, demanded by CEO Conn, would have caused such impact to medical staff, for fear of losing their jobs, because of disobedience to President Conn's commands, that any wrong doing would have stopped.

Instead, knowing after the fact of widespread abuse, as well as sometimes before it happened, President Conn never once said, "Make this wrong doing, to save operating expenses, cease to exist," or some other paraphrase similar in meaning; or if he had, Conn never enforced his words. If he had, all unlawful and wrong doing would have stopped immediately, rather than happening over

and over again throughout FDOC's prison population, (such as to Plaintiff Malik).

There can be no reason to excuse the amount of torturous suffering of injuries, pain, and mental anguish caused to medical prisoners (like Malik) in this widespread affected area, and time frame; and to so many individuals; all brought about by Conn's failure to stop unlawful practices that he knew occurred. Every violation committed by the Defendants that caused the Plaintiff pain and injury because of inadequate medical treatment (listed in this suit) is at least partially due to Conn's cost-saving policy.

**2) Dr. David J. Reddick** is a defendant in this lawsuit, and is being sued in his individual capacity for injuries and pain, as well as mental anguish, caused Plaintiff Malik by Dr. Reddick's unlawful practices. Defendant Reddick might also be sued in his supervisory capacity, as well.

Dr. David J. Reddick was directly employed by CEO Conn, as Wexford's Regional Medical Director of Region IV, to essentially supervise and control all the major medical treatment and medications throughout Region IV, including Everglades C.I. Dr. Reddick's duties, outlined by the scope of his employment, were to enforce Wexford's rules and policies, including, but not limited to his, or his subordinates approving and disapproving of medical treatment and drugs.

His decisions to approve or disapprove medical services should have been dependant on whether the treatment or medication was sufficient in controlling whatever circumstances it was dealing with. Often, though, because of Defendant Reddick's willingness to overlook what he knew in his mind and heart to be right; he gave in to Defendant Conn's urging and encouragement towards Wexford's cost-saving policy, irregardless of the consequences; and prisoners (like Plaintiff Malik) suffered injury and pain by his actions. Medical treatment and medication was approved or disapproved, not by whether it worked, or what worked best; but it was approved or disapproved by Dr. Reddick and his medical staff (in accordance to Wexford's cost-saving policy), by whatever medical treatment or medication was the least expensive, regardless of the consequence of its use, or the matter for which it was determined.

Dr. Reddick had an ongoing responsibility to answer to Conn periodically about Wexford's medical expenses, and account for any excessive spending for medical services rendered, that resulted in a financial cost over-and-above the allotted budget. Because any large amount of failure to keep Wexford's medical budget contained, within itself, instills skepticism as to Reddick's capabilities, it is apparent by the Regional Medical Director's actions, that he was willing to go to extremes; even so far as violating prisoners' (such as Malik's) Eighth

9

Amendment constitutional medical rights, in order to stay within the budget's perimeter. Valuing his position as regional medical director, Dr. Reddick's regard for Conn's cost-saving policy was held in the highest esteem.

The enforcing of Defendant Conn's policies by Defendant Reddick was so widespread as to cause many injuries and much suffering to prisoners, particularly the cost-saving policy as it affected the Plaintiff. Because of the unconstitutional provisions of this policy, in which Dr. Reddick was responsible for the approving or disapproving of medical treatment and drugs requested by Plaintiff Malik's attending physicians for his personal use, the Plaintiff underwent an immeasurable amount of injuries, pain, and mental anguish daily, while seeking relief over 100 times from licensed medical staff. Malik went to medical over 100 times in the four years reflected in this lawsuit. Each time he sought relief for his serious medical needs and pain, that he was forced to endure for much longer than only these days that Malik saw medical staff, with some of his pains and injuries caused by Dr. Reddick's actions.

As much as half of the time the Plaintiff suffered (or more), it was because of the actions of Dr. Reddick and/or his subordinates of medical staff (one being **Dr. Hosseini**) that unlawfully approved and disapproved Malik's drug and treatment exception requests from medical practitioners at Everglades C.I.,

by unconstitutional cost saving practices that caused injury or failed to overcome the injury it was meant to cure. (Wexford's cost-saving policy)

Dr. Reddick is being sued for the sufferings his actions caused, because his frame of mind in knowing, through his own past medical experience, that those actions would cause injury and pain. Not only did Dr. Reddick cause suffering in his actions, but he supervised his subordinates in such a way that they unlawfully caused the Plaintiff injury and pain, with Defendant Reddick failing to stop the unconstitutional practices that he knew beforehand by his own doings; making him partially responsible to Malik.

In valuing their medical position, Dr. Reddick supervised his subordinates in such a way as to show a threat to medical staff that failed to conform to Conn's cost-saving policy. The threat of losing one's job, whether real or a scare tactic, along with Conn's cost-saving reward program sufficiently supports an inference that Dr. Reddick directed his subordinates to act unlawfully and failed to stop them from doing so. Drug Exception Requests also show his unlawful efforts to save Wexford money at Plaintiff Mailk's suffering.

**3)** What is significant to this claim is that the cause against the five defendants, that acted as agents of Wexford, is ongoing for approximately four, years, with three of the five instrumental in the happenings in the majority of the claim.

**Dr. Hosseini, Dr. Balmir, Dr. Ortega, Dr. Gaxiola, and ARNP Louissaint** are all being sued in their individual capacity; with the exception that Dr. Balmir being the Chief Health Officer at Everglades C.I. for most of the claim, could also be sued in his supervisory capacity.

**Dr. Seyed Hosseini** is being sued for his unlawful and unconstitutional actions, as a Chief Health Officer at South Florida Reception Center, where Drug Exception Requests, from practitioners at Everglades C.I., are approved or disapproved. Defendant Hosseini took part in this process and/or had others take part for him or in his behalf, where unlawful and unconstitutional actions took place as a means to save money, conforming to CEO Conn's cost-saving policy; making the cost saving initiative so as to succeed in receiving a cost saving reward, at the expense that caused the Plaintiff new injury and pain, or aggravated injury and pain to already existing suffering.

Both Dr. Reddick and Dr. Hosseini were told various drug and treatment, they each approved for the Plaintiff, did not work in controlling **Neuropathy** symptoms and pain, that Plaintiff Malik suffered. Both were told by either Dr. Balmir, Dr. Ortega, or ARNP Louissaint several times or more, but both persisted in disapproving the more expensive treatment and drug that worked to control Plaintiff's injury and pain; and approving the least expensive treatment

12

and medications that did not work to control Plaintiff's medical dilemma; and that, often times, made his injury and pain worse.

Inexpensive drugs that did not work or that worked a little, were approved by Dr. Reddick and Dr. Hosseini for long periods of three, six, or nine months at a time to conform to CEO Conn's cost saving plan. Two such drugs are Elavil and Naproxin to control neuropathy symptoms and pain, instead of their more expensive Neurontin and Ultrom counterparts that did a much better job of controlling neuropathy symptoms and the pain associated with it; even eliminating Plaintiff Malik's suffering in most cases. The difference in Dr. Reddick's actions, and that of Dr. Hosseini were insignificant in that they acted alike in their Eighth Amendment constitutional violation; except for the fact that Dr. Reddick acted in his individual state and his supervisory state, while Dr. Hosseini committed his unlawful actions under his own accord (individual capacity).

Plaintiff Malik sues **Defendants Balmir, Gaxiola, Ortega, and Louissaint** in their individual capacity claiming they were each deliberately indifferent to his serious medical needs by intentionally and maliciously denying him proper medical care and treatment for his Hepatitis-C, and Diabetic Neuropathy. Defendants' actions violate civilized standards of decency and involves the unnecessary and wanton infliction of pain.

13

The Defendants acted with a reckless disregard to a substantial risk of serious harm to the Plaintiff, in their treatment of his known Neuropathy; and their non-treatment of his known Hepatitis-C. In that, even laypersons know that Hepatitis-C is life threatening; and that Neuropathy, which attacks the limbs, as well as hands and feet can be very painful; even a layperson would have recognized the necessity for a doctor's attention (or adequate treatment).

The Defendants knew that Plaintiff Malik was in serious medical need of treatment for his Hepatitis-C, but they failed or refused to obtain medical treatment at Everglades C.I., or send him to a facility where the Plaintiff would be treated. They knew that their treatment of Neuropathy was inferior to the treatment needed, and the harm that the Plaintiff would be caused by their individual actions; and yet, they each intentionally chose to treat the Plaintiff with inadequate treatment. They knew by their actions that Plaintiff Malik would suffer injury and pain, and they ignored their knowing and treated the Plaintiff with an inferior treatment that they positively knew would cause suffering to Plaintiff Malik.

What is even worse though is that the treatment that the Plaintiff needed, but was denied, was done for non-medical reasons. Malik was denied medication and treatment because of cost; with wanton disregard for the fact that the more

14

expensive medical treatment worked, while the least expensive did not in dealing with the Plaintiff's serious medical need.

Furthermore, Plaintiff Malik was denied all of his serious medical need to be treated for **Hepatitis-C** before it became life threatening. To comply to CEO Conn's cost-saving policy, he was not treated. Plaintiff's Hepatitis-C required medical treatment that he did not get and because of that, he suffered injury and pain needlessly from its symptoms. Constipation was one of many painful ongoing Hepatitis-C symptoms that he suffered, as well as joint pains.

## C. DATES AND FACTS

The dates and facts are listed per individual Defendant starting with President and CEO Conn.

### a) Daniel L. Conn, CEO

1.  Defendant Conn is being sued in his Supervisory capacity.

### (COUNT I)
Cost-Saving Policy

2.  As the President and Chief Executive Officer of Wexford Health Services Inc., David L. Conn was responsible for the operation and medical management of services provided to Florida Department of Corrections' Region IV, prison medical facilities.

15

3.      In his position, Defendant Conn implemented, changed, or condoned already existing policies to govern the actions of his subordinates in the treatment of the prison population that they represented medically.

4.      President Conn oversaw the widespread ordering and issuing of medical services by setting up guidelines that he expected Wexford's employees and agents to abide by, even though some of his directives were unlawful and/or unconstitutional.

5.      CEO Conn's action(s) were responsible for the manner in which the medical facility at Everglades C.I. was operated (the Institution that housed Plaintiff Malik).

6.      His actions, alone, were so widespread as to affect every medically treated prison inmate in FDOC's Region IV (literally thousands upon thousands of people); and did.

7.      When Wexford won the contract as FDOC's medical server for Region IV, Conn condoned a cost-saving policy. It was widespread among every medical prison facility in the Region and was placed in effect before the date (January, 2010) for which the violations of this lawsuit are alleged as occurring. (starting date)

8.      At approximately the same time as the cost-saving policy started, Defendant Conn also introduced an incentive program aimed at rewarding

16

his medical staff monetary payment for succeeding in saving Wexford and D.O.C. the cost of doing business.

9.     Conn's goal was to operate Wexford's medical service in such a way as to make money. In order to do that Conn concluded that Wexford's cost of doing business had to be low enough to conform to the reduced price of his bid, and still maintain the adequate medical standards expected of him.

10.     Under normal circumstances this might have been possible with Wexford guaranteeing adequate medical treatment and still making a profit.

11.     However, with the ever rising cost of medical staff and treatment, and the fact that Conn gave the lowest possible bid to secure winning the contract, some of the areas of the contract would receive the barest of minimal health care services or none at all, much to Conn's acceptance and condonement.

12.     Hepatitis-C is one such need that received very little funds to treat prison inmates like the Plaintiff. His medical records show that the entire, almost, five years addressed in this lawsuit, his Defendants, all even Conn, knew that Plaintiff Malik had Hepatitis-C, and not once was he ever treated for it at Everglades C.I., nor sent to any other facility (prison or otherwise) to be treated for this life threatening disease.

17

13. Conn found it impossible to meet the high medical standards of ensuring adequate medical care at a price that Wexford could afford and still make a profit, so he utilized his cost-saving policy in such a way that often, by his authoritative directions, prisoners, such as Malik, suffered pain and injury needlessly, except for his policy.

14. What the cost-saving policy, on the most part, entailed, is evident in the instant case, but was widespread throughout all of Region IV and many, many inmates were injured and suffered pain under the same bosses, even though different issues.

15. A serious medical need would suffice, like with the Plaintiff; and a practitioner would tend to the individual; and suggest a treatment plan.

16. In Plaintiff Malik's case, he showed symptoms of Hepatitis-C, but no treatment plan was ever suggested by the medical staff treating him or by the Regional Director, **Dr. Reddick**, even though many times he was advised that the Plaintiff had the Hepatitis-C virus.

17. In that **Hepatitis-C treatment** was very expensive to treat and control, it would be a mistake to think that when Dr. Reddick found out one of the prison population that he medically reigned over had Hepatitis-C that he did not inform his boss, Defendant Conn, immediately.

18

18.    Conn's cost-saving policy would not permit the Plaintiff's Hepatitis-C to be treated. The cost of doing so was so counterproductive and prohibitive towards saving money.

19.    **Dr. Reddick** was advised that the Plaintiff had Hepatitis-C: four times in 2010, 2/15/10, 6/17/10, 6/18/10, and 6/24/10; two in 2011, 01/11/11 and 04/07/11; at least once in 2012, reflected on Specialist Consultation Request dated 3/15/12 that was disapproved by Dr. Reddick; five times in 2013, with Drug Exception Requests to Reddick 01/04/13 and 02/12/13, and D.E.R.'s to Hosseini on 03/08/13, 05/31/13 and 06/07/13, all noting the fact that Malik (the individual for which practitioners sought treatment) had HCV or Hepatitis-C+; 2014, at least one time on 04/10/14.

20.    With **Dr. Reddick** being advised of the Plaintiff's Hepatitis-C condition, it would be erroneous to think that Defendant Conn did not know that Malik's HCV condition needed treatment, but because of cost involved in treating Hepatitis-C, the Plaintiff was never once, in the entire time in which he was housed at Everglades C.I., received treatment for this life threatening disease, nor did any other inmate, attested to by Dr. Ortega's assertion on august 18, 2014.

21.    Defendant Conn knew about Plaintiff's complaints of symptoms and pain that could have very easily been attributed to Hepatitis-C, that

required treatment, but because of the extreme expense of treating the disease, Conn purposely ignored his knowledge of the substantial serious harm he put Plaintiff Malik (and many, many other inmates with Hepatitis-C throughout Region IV) in and denied him HCV treatment at Everglades C.I. or transfer him to another institution within Region IV to obtain treatment.

22.   The reason could only have been, that because of Wexford's cost-saving policy, and the prohibitive cost of treating Hepatitis-C; the disease was not adequately or properly treated at any of Wexford's medically operated facilities; meaning that the issue of treating Hepatitis-C with an adequate treatment plan was slim-to-none, at best, and the disease, which was so widespread throughout the region, went untreated or treated with minimal insufficient health care, with many inmates (like the Plaintiff) needing Hepatitis-C treatment, and suffering harm by not receiving it.

23.   Every complaint in this lawsuit can be classified as Hepatitis-C related, when dealing with neuropathy symptoms and pain. Many of the injuries of Hepatitis-C are similar, if not the same as neuropathy injuries, including: rashes, constipation, pain in joints, lower limb edema, and pain elsewhere.

### b) Dr. Reddick

### (COUNT II)
Cost Saving Actions

24.     Conn's cost-saving policy was so demanded by Wexford's President and CEO, that often times Conn knew beforehand, that to comply to his rule, subordinate Dr. Reddick and Dr. Hosseini would make illegal and/or unlawful decisions as to what medical treatments and medicines to treat inmates (including the Plaintiff), by their cost and not by their efficiencies in treating the medical situation, yet he failed to stop the constitutional violations and inmates (such as Malik) needlessly suffered.

25.     In particular, the foregoing shows various instances where Dr. Reddick knew that a particular drug or treatment worked well in controlling a medical situation, much better than another drug categorized as treatment for the same problem (which in essence worked very little, if any to overcome the medical need), but because Conn's cost-saving policy, Dr. Reddick disapproved the more expensive treatment that worked in favor of approving the less expensive treatment that did not work, as a means to save Wexford and D.O.C. the cost of doing medical business.

26.     This happened often, and the Plaintiff suffered injury, pain, and mental anguish, so listed in the following with the showing that Dr. Reddick knew beforehand that the more expensive treatment and drug worked much

21

better that the least expensive; and so shown by past records, before violations occurred.

27.     Furthermore, working treatment and drugs that were snubbed, so that unlawful and/or unconstitutional treatments could be used, for the sole purpose of saving money, were reinstated after long uses of inadequate medical services caused the Plaintiff severe pain and sufferings, much of which was unnecessary, except for Conn's need to save money.

28.     In that the treatments that worked were much more expensive to Conn's cost-saving policy, and Dr. Reddick, reporting to the CEO any event that jeopardized that policy, it is evident that President Conn knew when the cost factor of his cost of doing business was lopsided to his expectations of inexpensive drugs and treatment; which led to greater demands to save.

29.     From 08/21/09 to 04/30/10, Dr. Reddick approved a treatment plan and drug for Plaintiff Malik that controlled his neuropathy symptoms and pain. The treatment consisted of treating the Plaintiff twice a day (BID = am + pm), with the very expensive drug (in comparison to other neuropathy drugs) Neurontin 300 mg. Neurontin BID daily $1.66/ Elavil daily $1.00.

30.     The Plaintiff's past medical records for 2010, from January through April 30th, clearly show that Malik only went to medical one time for neuropathy symptoms and pain and that was January 14, 2010.

22

31.   Further records show that after the Neurontin stopped on 4-30-2010, the Plaintiff went to medical complaining of neuropathy injuries and serious pain on 5/3/10 and 6/17/10.

32.   What is also apparent, by the record, is that on 6/17/10 ARNP Louissaint requested treatment of Neurontin 300 mg (twice daily) for the Plaintiff, to be taken from 06/18/2010 through 01/15/2011. It was disapproved by Reddick, even with Louissaint stating that she was requesting Neurontin because it worked to control Plaintiff's neuropathy. His advice to the situation was to try Elavil. Elavil did not work to control Plaintiff's neuropathy, nor pain, and the Plaintiff suffered needlessly.

33.   On 06-18-2010, ARNP Louissaint requested Elavil, per Dr. Reddick's suggestion it was approved but not received.

34.   Then on 06-24-2010, Elavil was requested again for the Plaintiff; to be taken from 6/24/10 through 01/22/2011; in compliance to Conn's cost-saving policy.

35.   This was a treatment plan that would occur, with Malik taking 50 mg of the much less expensive Elavil drug, that did not work nearly as well as Neurontin taken twice daily. Because of this he suffered greatly.

36.   The past record clearly shows this assertion, in that the Plaintiff went to medical eleven times in the next eight months for neuropathy related

symptoms, injuries and pain demonstrated by the following days: 7/2/10, 7/6/10, 7/8/10, 8/5/10, 8/2/10, 8/23/10, 8/11/10, 9/3/10, 9/19/10, 10/25/10 and 12/1/10.

37.   For an equivalent amount of time (approximately 8 months), while taking Neurontin twice daily, Plaintiff Malik went to medical once for the same purpose of neuropathy injuries and pain. He went to medical for the same or similar conditions, while using the less expensive Elavil once daily, eleven times, in which Elavil never controlled the pain and injuries that Neurontin did. Daily use of Elavil cost approximately $1.00 for 50 mg, and did not work to control Plaintiff's neuropathy. In fact, Malik suffered severe to moderate pain almost daily during that time.

38.   From 01-11-11, when the new Elavil prescription was approved by Dr. Reddick, even knowing that it was inferior to Neurontin twice daily; through to his approved date of 11/5/11, Plaintiff Malik took the less expensive Elavil, once a day (50 mg).

39.   His medical records plainly show that the Plaintiff went to medical for neuropathy injuries and pain left uncontrolled, 8 times in 2011; going only when the continual injuries and pain associated with neuropathy caused him to suffer more than he could bear.

24

40.    In 2011 Plaintiff went to medical complaining about neuropathy related injuries and pain on 01/06/11, 04/06/11, 05/03/11, 06/14/11, 08/01/11, 10/08/11, 10/28/11, and 10/31/11.

41.    On 10/28/11, ARNP Louissaint filed a Drug Exception Request asking for Neurontin 300 mg, stating on the D.E.R. form that Elavil did not work in controlling Plaintiff's neuropathy. <u>Reddick disapproved the request</u> stating try Elavil.

42.    On 11-2-11 Elavil was approved by Dr. Reddick, when requested from ARNP Louissaint until 5-31-12, but the Plaintiff refused this treatment plan and drug. He had already refused the same Elavil treatment plan on 9/14/2011 for the duration of the prescription because the medicine did very little to control his injuries and pain.

43.    After talking to Dr. Reddick about the Plaintiff's (BID) treatment of Neurontin 300 mg twice daily being cost prohibitive to Conn's cost-saving policy; Dr. Balmir informed the Plaintiff that if he confirmed to Dr. Reddick that Elavil did not work to control the Plaintiff's injuries and pain; and if he was willing to cut the BID neuropathy treatment of Neurontin by half (or take the single dose daily so as to defer the cost of BID), then Dr. Reddick would approve Neurontin.

25

44.   Plaintiff Malik has diabetic neuropathy, for which there is no cure for, but there is treatment that will slow progress of the disease; relieve pain; manage complications and restore functions.

45.   There are several medicines used to control neuropathy and pain, but not every medicine works for every individual.

46.   **Anti-seizure medications** (like Neurontin, which can be administered safely up to 1800 mg daily) are prescribed and work to relieve nerve pain for some individuals with severe neuropathy pain.

**Antidepressants** (such as Elavil); an amitriplyline, may provide relief for mild to moderate neuropathy symptoms and pain, but has very little effect on the Plaintiff's severe case of chronic neuropathy.

47.   On 11/28/11, Dr. Balmir requested Neurontin once a day (300 mg), cutting the dosage known to work in half; and stated that Elavil did not work to control the Plaintiff's severe neuropathy. The Drug Exception Request was approved by Dr. Reddick until 1/24/12; and the single dose daily of Neurontin saved Wexford and DOC even more money, under the cost of Elavil, in that a single 50 mg dose of Elavil daily cost about one dollar, with a single 300 mg dose of Neurontin daily cost only 83 cents.

48.   On 1/23/12, when ARNP Louissaint requested a renewed prescription of Neurontin under the same conditions as previously requested by Dr.

Balmir, Dr. Reddick approved the request for a single dose (300 mg) of Neurontin daily, good through 3/23/12.

49.   This method of requesting 300 mg daily of Neurontin to treat Plaintiff Malik, worked again for Dr. Balmir, when he applied for a renewed prescription again on 4/30/12, good through 11/27/12. However, the review of the Plaintiff's medical records clearly showed Dr. Reddick that even with Neurontin, the single dose of 300 mg daily still caused Plaintiff Malik unnecessary neuropathy injuries and severe pain. The cutting of treatment know to work, from two doses to one, still caused the Plaintiff to suffer needlessly, except for Wexford and/or DOC, to save the cost of doing medical business. Reddick knew that he was violating Malik's constitutional Eighth Amendment right to be adequately treated; chose to ignore that knowledge; and the Plaintiff was severely injured over and over again.

50.   On 6/14/12, Maria Louissaint, ARNP, convinced Dr. Reddick that although his actions of approving only a single dose of Neurontin (300 mg) daily saved the cost of doing Wexford's medical business; it also caused the Plaintiff unbearable neuropathy pain and injury: suffering caused by the single dose of a medication meant to be taken both a.m. and p.m., in that it loses half of its strength and power within five-seven hours after

27

taken. Having convinced Dr. Reddick of this fact by Plaintiff's medical records, Dr. Reddick approved Neurontin 300 mg, BID (a.m. + p.m.) on 6/14/12.

51.    The medical record from January 01, 2012 through June 14, 2012 will show that the Plaintiff went to medical eleven times for neuropathy conditions: 01/09/12, 01/19/12, 01/26/12, 01/27/12, 02/03/12, 02/06/12, 03/15/12, 03/20/12, 04/20/12, 04/22/12, and 05/31/12. Dr. Reddick's efforts to conform to Conn's cost-saving policy inadvertently caused Plaintiff Malik unnecessary suffering that could have easily been avoided; pain and injury that Defendant Reddick knew would occur from his own experience and Malik's past medical history, yet he ignored that fact and purposely acted in such a way as to cause the Plaintiff harm.

52.    It would be inconceivable to think that, even Dr. Reddick, would take it upon himself, to violate Plaintiff's constitutional rights to having his serious medical need met, without discussing it with CEO Conn before committing the unlawful act.

53.    Defendant Conn knew that denying Malik Neurontin twice daily would be unlawful and he did not bother to stop Dr. Reddick's actions, but encouraged him instead to violate Plaintiff's Constitutional rights.

28

54.     The Plaintiff's approved Neurontin medicine was short lived and stopped on 7/31/12, only to start back up on 8/17/12, after Malik suffered neuropathy conditions and pain on 8/2/12 and 8/13/12.

55.     While on the double dose of Neurontin, on 09/04/12, Plaintiff Malik had a chronic illness clinic in which he admitted to having no neuropathy symptoms or pain, due to the double dose treatment plan.

56.     Still not suffering from neuropathy, Malik's treatment changed again on 9/28/12, when it was related to him that to save the cost of Neurontin, on October 1, 2012, his treatment would change to a pain medication treatment of Ultrom twice daily.

57.     Dr. Reddick was in direct contact with Everglades C.I. practitioners and especially CHO Balmir, organizing less expensive methods in which to treat the Plaintiff's ongoing neuropathy conditions and pain, but none worked as well as 300 mg of Neurontin twice daily, as proven by his medical records outlining the Plaintiff's many medical visits.

58.     In summary of Dr. Reddick's actions, which were unlawful and/or unconstitutional, and that Defendant Conn knew would take place, but **failed** to stop those events; in 2013 from January 1st through April 1st, during all periods of time when Malik received Ultrom or Neurontin twice daily, the Plaintiff had no neuropathy complications, except on 05/19/13,

29

when he was taking Ultrom twice daily. The combinations of either/or Neurontin/ Ultrom twice daily worked to control Plaintiff's suffering, but both medications taken twice daily together made Plaintiff's neuropathy worse.

59.     Between 3/19/13 and 4/19/13, when Malik received Neurontin twice daily; and 4/01/13 and 4/19/13, when he also received Ultrom twice daily, on 4/01/13 and 4/11/13 the Plaintiff had neuropathy injuries so bad, with very severe pain, that on 4/19/13, he was taken off of both Neurontin and Ultrom and **for four months he got no drug exception medication.**

### c) Dr. Hosseini

60.     Malik was allowed to suffer those four months with only Naproxin to lessen his pains. Even though Neurontin was requested three times in those four months; 5/29/13, 6/6/13, and 6/11/13, the requests for Neurontin were refused all three times by Dr. Hosseini, with Dr. Hosseini recommending that the Plaintiff be treated with Elavil on 6/7/13.

61.     Through the remainder of the year, Malik got Ultrom in all of August and Elavil from 9/23/13 through 11/30/13 and again 12/12/13 through 12/22/13.

62.     In receiving no requested neuropathy medication in four months, to receiving inadequate Elavil; from 04/01/13 through to the end of the year,

Conn's cost-saving policy caused the Plaintiff to suffer greatly, having severe pain as indicated in his going to medical 18 times for neuropathy conditions and pain: 4/1/13; 4/11/13; 5/13/13; 5/21/13; 5/29/13; 6/11/13; 7/11/13; 7/17/13; 8/1/13; 8/8/13; 8/13/13; 8/19/13; 9/4/13; 9/17/13; 9/19/13; 10/17/13; 11/17/13; and 11/20/13; while helping Hosseini to earn his reward, because his cost saving action in conjunction with Conn's cost-saving policy saved Wexford and D.O.C. 3.9 million dollars in business expenses, part of which was at the expense of Malik's suffering.

63.    During January 1, 2014 through October 17, 2014, the Plaintiff went to medical 25 times for very painful neuropathy injuries, cause by inadequate medical treatment.

64.    Very rarely, if ever, did the Plaintiff go even one single day without some sort of neuropathy symptoms and pain, needlessly, in that not once during this entire time was Malik prescribed Neurontin to deal with his suffering. Neurontin was the only drug that seemed to work most of the time, but because of its expense, CEO Conn refused to allow prisoners to receive it in all of 2014. Malik, as well as all prison inmates in Region IV were made to suffer because of the cost of Neurontin, explained to him by Dr. Ortega.

31

65.     Plaintiff Malik went to medical in 2014 suffering pain and neuropathy injuries because of the actions of Reddick and his subordinates, that approved and disapproved drugs in his behalf, as a measure to please CEO Conn by conforming to his cost-saving policy.

66.     It was discovered in August of 2013, while Plaintiff took only the pain medication Ultrom twice daily (a.m. and p.m.) that the Tramadol medication (50 mg), while working better than Elavil, still did not control Plaintiff's acute neuropathy nor the pain associated with it.

67.     Even so, as a cost saving medication, Dr. Reddick approved Ultrom over Neurontin knowing the pain and suffering that he literally caused the Plaintiff by his actions. Dr. Reddick purposely chose to cause Plaintiff Malik to suffer, just so he could save some of Wexford and D.O.C.'s cost of doing their medical business.

68.     From January 17, 2014 through April 12, 2014 (4 months) Plaintiff Malik was approved to be treated with Elavil, that did not work to control his neuropathy, but it was inexpensive to use: and because of its use, he suffered greatly, going to medical eleven times; 1/14/14; 1/21/14; 1/22/14; 2/19/14; 2/20/14; 3/17/14; 3/18/14; 3/27/14; 4/3/14; 4/10/14; and 4/11/14, with severe pain.

32

69.     From 4/15/14 through 9/13/14, while receiving the inexpensive Ultrom treatment, approved by Conn's Regional Medical Director; the Plaintiff went to medical 14 times for neuropathy related symptoms and pain: 5/1/14;  5/20/14;  5/22/14;  5/23/14;  6/12/14;  6/25/14;  6/26/14;  7/3/14; 7/24/14; 8/18/14; 9/2/14; 9/23/14; and 10/09/14.

70.     This is the extent of the evidence against Daniel L. Conn; David J. Reddick; and Seyed Hosseini.

### (COUNT III)
Hepatitis-C

As far as Defendants Balmir, Louissaint, Ortega,
and Gaxiola, here is a brief summary of their violations.

71.     In the time of this lawsuit, the Plaintiff went to medical over 109 times, usually seeing Dr. Balmir, ARNP Louissaint, Dr. Ortega, or in 2014, Dr. Gaxiola.

72.     In all that time, and on numerous occasions, all four Defendants knew that Plaintiff Malik had Hepatitis-C, so noted in his medical charts; but not once did any of the Defendants order Hepatitis-C treatment for the Plaintiff, even though many, many he complained about symptoms, purposely diagnosed as neuropathy; just so the disease did not have to be dealt with; when these same symptoms and pain could have been Hepatitis-C related.

73.     Because of the very expensive cost of treating, Hepatitis-C was prohibitive to Defendant Conn's cost policy; the symptoms of the disease was diagnosed as being anything else (neuropathy) to avoid the expenditure of treating the disease with adequate Hepatitis-C treatment.

### YEAR: **2010**

74.     To be specific in dealing with the Defendants, at least 3 times in 2010, Dr. Balmir ordered lab tests, where the results indicated by AST and ALT readings that the Plaintiff's Hepatitis-C was out of control and needed treatment: 01/01/10; 09/09/10; and 12/28/2010. Dr. Balmir was also aware that the test results of Plaintiff ordered July of 2009 had SGOT (AST at 78) and SGPT (ALT at 137), both over twice as high as normal, showing that Plaintiff's Hepatitis-C needed treatment.

75.     Dr. Ortega picked up the test results in all 3 instances, giving reason to know of the Hepatitis-C symptom results being high before he signed for the reports, knowing by glancing over the lab sheets that Plaintiff's HCV needed treatment.

76.     Chronic illness clinics, which ARNP Louissaint was in control of for June 5, 2010 and 9/15/2010, show that on these dates that she too was fully aware that the Plaintiff had Hepatitis-C needing treatment, because it and its test results were listed in the "CIC" charts.

34

## YEAR: **2011**

77.     Seven times in 2011, Defendant Louissaint knew that Malik had Hepatitis-C that needed treatment; twice when she received the results of his lab tests that she ordered (06/22/11 and 10/19/11); three times so noted in his chronic illness clinics (01/06/11, 04/06/11, and 08/01/11) with the "CIC" in January and August reflecting Plaintiff's Hepatitis to be out of control; and twice in filling out Drug Exception Requests, she states that Malik has HCV on 01/06/11 and 04/06/11.

78.     Dr. Ortega signed for Plaintiff's lab reports on 10/20/11, showing that on that date that he knew Malik's HCV needed treatment.

## YEAR: **2012**

79.     On 04/18/12, Dr. Balmir knew by Malik's lab reports that he ordered and received, as did Dr. Ortega in signing and picking up the results for CHO Balmir, that the Plaintiff's Hepatitis-C was out of control and required treatment.

80.     Dr. Ortega's referral of Malik to a neurologist specialist on 3/15/12, shows that on that date, where Dr. Ortega lists the Plaintiff as having HCV+, with the + signifying out of control Dr. Ortega knew that Hepatitis required treatment.

81.    The + in HCV+ indicates Hepatitis out of control. Chronic Illness Clinics held by ARNP Louissaint on 11/26/12, 4/27/12, 9/4/12, and showing HCV+ on their charts, showed that on all three of those dates Defendant Louissaint knew that Malik's Hepatitis required treated medically.

YEAR: <strong><u>2013</u></strong>

82.    In 2013, Dr. Ortega knew that Plaintiff Malik had HCV+ that required treatment by the results of the lab test he picked up on 5/28/13 and 9/28/13. He showed, by the Drug Exception Request on 1/2/13, that Malik had Hepatitis-C needing treatment by signifying it with HCV+.

83.    By the Drug Exception Request that he was responsible for, Dr. Balmir, on 3/15/13, showed with the symbol HCV, that he knew that the Plaintiff had Hepatitis.

84.    It is certain that Defendant Louissaint knew, by her indication of HCV+ that on 2/11/13, 5/28/13, and 6/6/13, filed in her Drug Exception Requests, that Malik had Hepatitis requiring treatment, as was true in the Chronic Illness Clinics that she was responsible for on 2/11/13, 6/11/13, and 10/17/13.

## YEAR: **2014**

85.     There are four dates in 2014 that shows that Dr. Ortega or ARNP
Louissaint knew that the Plaintiff had Hepatitis-C. All four where Chronic
Illness Clinics, on 2/20/14 and 5/23/14, Defendant Louissaint was
responsible for the clinics. On 8/18/14 and 9/2/14, Dr. Ortega was in
charge of the clinics.

86.     It was on 9/2/14 that Dr. Ortega confessed to the Plaintiff the fact that
Malik never had treatment for Hepatitis-C at E.C.I., nor did any other
inmate. Everglades C.I. was not equipped to treat the disease and never
was, according to Ortega. Treatment was too expensive.

87.     The point is that Plaintiff Malik suffered from constipation; not being
able to urinate (both painful at times); pain in his various body joints (feet,
knees, ankles, shoulders and back), sometimes moderate, but most of the
time it was so severe that Malik could not focus on anything else; bilateral
edema in both his legs and feet; and rashes all over his body.

88.     All of these symptoms can be HCV+ related and seem to be more acute
when Plaintiff's AST and ALT levels were at their highest.

89.     Some of these symptoms are attested to as being strictly Hepatitis-C
related on the Mayo Clinic's website at **www.mayoclinic.org/diseases-**

**conditions/Hepatitis-C** (consisting of basic informative information, that the Plaintiff found out for the first time on 10/24/14 at Santa Rosa C.I.).

90.  Had Plaintiff Malik known previously, when he was first diagnosed as having Hepatitis-C; or up through the years (2010, 2011, 2012, 2013 or 2014) that the very symptoms and pain that he experienced and when were diagnosed as neuropathy, over the years, could also have been HCV+ related as well; on finding that his neuropathy treatment wasn't working to eliminate his suffering once-for-all times; and making his suffer over and over again; Malik would have demanded to be treated adequately for Hepatitis-C.

91.  Instead, medical staff, to conform to CEO Conn's cost-saving policy (for there could be no other feasible reason to punish the Plaintiff over and over again with severe suffering of injury and pain), never bothered to enlighten Malik in any way as to this very dangerous, life threatening disease, in such a way as to give him a choice to be treated.

92.  Not once, over all that time, was he treated for Hepatitis, nor was he advised of treatment.

93.  Malik suffered with pain and injury needlessly for years and each of the Defendants knew the substantial harm they put the Plaintiff in by not

38

informing him of their action not to act in treating him for HCV+, and then, treating Plaintiff for the life threatening disease.

94.     Instead each Defendant (Balmir, Louissaint, Ortega, and Gaxiola failed to inform the Plaintiff of his extreme condition, purposely allowing Malik to suffer needlessly for days, weeks, months, and years; without giving a hint of the slightest idea why.

95.     Malik was kept in the dark about many of his neuropathy symptoms being Hepatitis symptoms, too, needing treatment of their own.

96.     Not only did the actions of Balmir, Louissaint, Ortega, and Gaxiola take away Plaintiff's constitutional right to be treated for a serious medical need, for which Hepatitis-C is, they also took away his right to know and to choose what treatment to accept based on the information about the HCV disease.

97.     Plaintiff was denied his right to have his Hepatitis-C treated simply because President and CEO Conn of Wexford chose not to pay for HCV+ treatment as an unlawful way to save money.

98.     During the time period of this complaint, Malik went to medical **109 times** in which some of was neuropathy treatment, some Hepatitis-C related, and some both. **About half of those times he did not see one of the Defendants.**

39

99.    The occasions that the Plaintiff complained about burning pain during his medical visits, he was probably complaining about neuropathy symptoms.

100.    When he complained about pain in his joints, Malik was referring to Hepatitis-C symptoms.

101.    Symptoms like constipation that could be HCV+ related were complained about on: 11/12/10; 12/1/10; 4/6/11; 8/1/11; 6/16/11; 4/27/12; 2/1/13; 10/17/13; 5/29/13; and 5/23/14.

102.    Symptoms of joint pains which were HCV+ related were complained about on: 7/6/10; 7/8/10; 4/6/11; 8/1/10; 6/15/12; 7/24/12; 8/2/12; 2/1/13; 4/1/13; 4/10/14; with trouble urinating addressed 11/23/11.

103.    40 times the Plaintiff had pain in his feet; sometimes the burning pain of neuropathy and other times, the joint pains of Hepatitis-C, with all four E.C.I. Defendants responsible for some of the diagnoses and treatment in either of the scenarios.

104.    In 2012, the Plaintiff had foot pains in his joints for nine consecutive visits to medical: 3/15/12; 4/27/12; 5/17/12; 5/24/12; 5/31/12; 6/8/12; 8/2/12; 8/13/12; and 9/28/12.

In 2013, eleven consecutive times: 2/1/13; 3/19/13; 4/11/13; 5/29/13; 7/17/13; 8/13/13; 8/15/13; 8/19/13; and 10/17/13.

And in 2014, 10 times: 1/14/14; 1/22/14; 2/14/14; 4/10/14; 5/1/14; 5/20/14; 5/22/14; 6/12/14; 7/24/14; and 10/9/14.

105.   Malik went to medical for leg pains, leg rashes, and bilateral leg edema 13 consecutive times in 2014 with 6 visits different than the foot pain visits: 3/18/14; 3/27/14; 5/13/14; 6/25/14; 7/3/14; and 9/23/14.

106.   In closing this issue of Hepatitis-C abuse, the Plaintiff concludes that Defendants Balmir, Louissaint, Ortega, and Gaxiola have acted in deliberate indifference to his serious medical need of having his Hepatitis-C, requiring treatment, treated; and that they each have shown calloused indifference in the many times that they each (and as a whole) treated Malik's Hepatitis-C symptoms as neuropathy, thereby making the Plaintiff suffer many times needlessly.

107.   The Defendants listed in correspondence to the dates are the individuals responsible for Malik's injury and pain or other sufferings on that date; and the medical visits where his medical symptoms could have been treated as neuropathy, when in reality, they were Hepatitis-C related:

Defendant Louissaint, 29 medical visits: 5/3/10; 6/15/10; 7/8/10; 9/15/10; 10/19/10; 11/12/10; 1/6/11; 4/6/11; 5/3/11; 8/1/11; 10/28/11; 1/19/12; 1/26/12; 4/24/12; 5/31/12; 6/18/12; 6/08/12; 11/10/12; 2/1/13;

11/11/13; 5/29/13; 6/11/13; 10/17/13; 1/21/14; 2/20/14; 4/3/14; 5/23/14; 7/3/14; and 10/9/14.

Defendant Balmir, 13 medical visits: 7/6/10; 10/8/11; 11/23/11; 12/12/11; 1/9/12; 2/3/12; 3/20/121 9/28/12; 3/19/13, a.m.; 3/19/13, p.m.; 8/8/13; 8/19/13; and 2/19/14.

Defendant Ortega, 8 times: 3/15/12; 11/17/13; 3/18/14; 4/10/14; 5/20/14; 5/22/14; 8/18/14; and 9/2/14.

Defendant Gaxiola, twice: 6/12/14 and 7/24/14.

108.   It is also probable that Dr. Ortega and ARNP Louissaint reported each medical visit that they were responsible for treating Malik to Dr. Balmir in that he was the Chief Health Officer at E.C.I. during most of the time this suit making him knowingly of any wrong doing that they might have done.

These are the facts and dates for which this suit is levied against all Defendants: President and CEO, Daniel L. Conn; Regional Medical Director, David J. Reddick; CHO Seyed Hosseini; CHO Carl Balmir; M.D. Dr. Ortega; ARNP Maria Louissaint; and CHO Dora Gaxiola.

### d) Dr. Carl Balmir

### (COUNT IV)
Neuropathy Pain and Suffering

109.   As to the pain and suffering of Plaintiff Malik; because of inadequate treatment for what Defendants Balmir, Louissaint, Ortega, and Gaxiola determined to be neuropathy, the Plaintiff's medical records clearly show the dates and procedures of each Defendant who failed to secure the only neuropathy treatment that seemed to work for the Plaintiff, and the suffering such actions caused.

110.   Dr. Balmir saw Malik on 7/6/10, where Plaintiff had ongoing complaints about neuropathy symptoms, injuries and pain. Dr. Balmir had personal knowledge that from 08/21/09 through 04/30/10. Malik's neuropathy was treated with Neurontin 300 mg twice daily and that the treatment worked to control his diabetic neuropathy.

111.   With that personal knowledge he also knew from the Plaintiff's past medical record (as did ARNP Louissaint and Dr. Ortega) that Elavil did very little to control the Plaintiff's severe neuropathy or pain.

112.   Knowing these facts, on 7/6/10, Dr. Balmir saw that the Plaintiff was receiving Elavil daily, and not Neurontin, which was the cause of his medical visit, since Elavil did not control the neuropathy disease. But instead of changing Plaintiff's treatment to Neurontin twice daily and

43

insisting that Malik receive the treatment; Dr. Balmir allowed Plaintiff's Elavil treatment to continue and Malik suffered many times with severe pain and injuries almost daily through to 01/22/2011.

113.   By conforming to CEO Conn's cost-saving policy and continuing the cheaper Elavil treatment that did not work for Malik's symptoms, Dr. Balmir purposely and willfully subjected the Plaintiff to severe sufferings where he went to medical on 7/8/10; 8/5/10; 8/2/10; 8/23/10; 8/11/10; 9/3/10;  10/19/10;  10/25/10;  12/1/10;  01/06/11;  04/06/11;  05/03/11; 06/14/11; 08/01/11; and 10/08/11, the date he next saw the Plaintiff; seeking medical relief for his neuropathy and severe pain.

114.   Each time over the next four years that Dr. Balmir treated the Plaintiff for diabetic neuropathy and let an inadequate neuropathy treatment continue unchanged (Elavil, or single doses of Neurontin, or Ultrom), the Plaintiff suffered injury and severe pain.

115.   On 10/08/11, Dr. Balmir allowed the Elavil treatment to continue unchanged and the Plaintiff suffered many times more than what is noted by his medical visits which include the following dates of medical visits for pain: 10/8/11; 10/31/11; 11/23/11; 12/12/11; 1/9/12; 2/3/12; 3/20/12; are dates in which Dr. Balmir saw the Plaintiff for pain and injuries

44

because he failed to order and insist that Malik receive Neurontin 300 mg twice daily.

### d) Dr. Oscar Ortega and Maria Louissaint, ARNP

116.    During that same time frame, where the Plaintiff saw either Dr. Ortega on 3/15/12; and ARNP Louissaint on 5/03/10; 6/15/10; 7/8/10; 9/15/10; 10/19/10; 11/12/10; 1/6/11; 4/6/11; 5/3/11; 8/1/11; 10/28/11; 1/19/12; 1/26/12; 4/27/12; 5/31/12; 6/08/12; and 6/18/12; he went to medical visits on these dates complaining of severe pain and neuropathy injuries but each of these two practitioners still failed to change Plaintiff's treatment plan to Neurontin twice daily; and Malik suffered greatly because of their actions (until ARNP Louissaint succeeded 06/14/12).

117.    From 06/18/12 through to April 1, 2013, nine months of taking Neurontin 300 mg twice daily, the Plaintiff went to medical only two times, 08/02/12 and 08/14/12; and that was when he was not taking Neurontin from 7/31/12 through 8/17/12.

118.    That was Plaintiff Malik's proof that Defendants Balmir, Louissaint, Ortega, Gaxiola, Conn, Reddick and Hosseini knew to be true: Neurontin 300 mg BID worked to control Plaintiff's neuropathy and pain, leaving no excuse why Malik should not be treated with this neuropathy treatment, other than it cost more to use than Elavil (in the dose needed to work).

119.   Even after the Defendants knew about the great resolution to Malik's neuropathy and pain dilemma; on 04/19/2013, the Plaintiff was denied Neurontin and would never get it again.

### e) Dr. Dora Gaxiola

120.   Malik saw ARNP Louissaint 4/19/13 and 6/11/13, who failed to give him any type of neuropathy treatment plan for 4 months; and then after that, even seeing Dr. Balmir, 8/8/13; and 2/19/14; Louissaint 10/17/13; 1/22/14; 2/20/14; 4/3/14; 5/23/14; 7/3/14; and 10/9/14; Ortega 11/17/13; 3/18/14; 4/10/14; 5/20/14; 5/22/14; 8/18/14; and 9/2/14; and Gaxiola 6/12/14; and 7/24/14; for neuropathy pain and injuries, Plaintiff never again received two doses of Neurontin 300 mg daily, and because of the actions of Defendants Balmir, Louissaint, Ortega, and Gaxiola, Malik suffered severely for over 17 months of tortuous, sometimes unbearable pain.

121.   Plaintiff went to medical to have his neuropathy and pain treated 5/21/13, 5/29/13, 6/11/13, 7/11/13, 7/17/13, 8/1/13, 8/8/13, 8/13/13, 8/19/13, 9/4/13, 9/17/13, 9/19/13, 10/17/13, 11/17/13, 11/20/13, 1/14/14, 1/21/14, 1/22/14, 2/19/14, 2/20/14, 3/17/14, 3/18/14, 3/27/14, 4/3/14, 4/10/14, 4/11/14, 4/15/14, 5/1/14, 5/20/14, 5/28/14, 5/23/14, 6/12/14, 6/25/14, 6/26/14, 7/3/14, 7/24/14, 8/18/14, 9/2/14, 9/23/14, and 10/09/14:

46

40 times in the next 17 months, where each time the neuropathy was treated with inferior medical treatment because it was cheaper than treating him with Neurontin 300 mg twice daily; and Plaintiff Malik suffered more than any person should have to ever suffer.

## V.   Injuries

The Plaintiff received many different injuries and much sever and moderate pain explained throughout Section IV, paragraphs "A" and "B" during the four year ongoing period that the lawsuit is about. The injuries were associated with neuropathy symptoms and untreated Hepatitis-C+ symptoms, not treated for more than four years.

## VI.   Relief

For Defendants' deliberate indifference to Plaintiff's serious medical need of being treated adequately for both neuropathy and Hepatitis-C and for the suffering of long periods of injury and pain and mental anguish because of inadequate treatment of both diseases, wherefore the Plaintiff requests this Honorable Court to enter judgment and grant him the below amounts:

1. $500,000.$^{00}$ from CEO Daniel L. Conn for the part he played in the injury and suffering caused Plaintiff Malik;

2. $500,000.$^{00}$ from Medical Director David J. Reddick

3. $200,000.$^{00}$ from Dr. Seyed Hosseini;

47

4. $500,000.<u>00</u> from each of the other defendants: Dr. Carl Balmir, Dr. Dora Gaxiola, Dr. Oscar Ortega and ARNP Maria Louissaint;

5. Defendant in Line One is being sued in his Supervisory capacity;

6. The rest of the Defendants are being sued in their individual capacity;

7. The Plaintiff also prays this Court for punitive damages of $300,000.<u>00</u> from Defendants Conn, Reddick, Balmir, Ortega, and Louissaint, *each*.

8. Or whatever amounts that Plaintiff proves in Court that he deserves.

## VII. Exhaustion of Administrative Remedies, Administrative Procedures

A. Plaintiff's claim arose while he was confined in a prison. The name of that prison is Everglades Correctional Institution.

B. Everglades C.I. had a grievance procedure which Plaintiff completed.

C. Plaintiff's grievance covered all of his claims at the institutional level.

   1. Inadequate medical treatment for diabetic neuropathy and Hepatitis-C.

   2. Pain and suffering.

   3. Ongoing injuries, pain and mental anguish due to inadequate treatment.

D. The Plaintiff filed grievances where the instant claims arose concerning the facts relating to this complaint.

E. 1. All formal and informal grievances were filed at Everglades C.I.

2. From March 5, 2012 through September 25, 2014, the Plaintiff filed 24 grievances claiming inadequate medical treatment, which caused him pain and injury, so listed in the following:

Section VII, Paragraph "E" 2 lists
21 of the most important grievances

2012

1. Grievance No.: 1010-401-121; Filed 10-16-10; Answered 10-28-10; grieved being given wrong medication, constant pain, uncontrolled diabetes, and neuropathy; Result: denied; Respondent: LPN Finese; and Reason: scheduled to see provider soon.

2. ADA Complaint dated: 3-5-12; answered: 3-12-12; grieved emergency issue of not being treated for serious medical needs dealing with neuropathy, diabetes, and Hepatitis-C; result: denied, stating that Plaintiff Malik was not impaired (even though the ADA specifically lists diabetes as impairment deserving ADA response).

3. Grievance No.: 1203-401-017; Sent: 3-5-12; Answered: 3-12-12; grieved severe pain caused by diabetes neuropathy: swollen feet, ankles, raw sores, and trying to see a specialist since 6-10-10, without ever seeing one; Results: grievance approved by Dr. Balmir.

4. Grievance No.: 1206-401-054; Sent: 6-18-12; Answered: 6-29-12; grieved that although Plaintiff's medical issues of neuropathy symptoms, diabetes

49

and pain were formally addressed by Dr. Balmir and approved on 3-12-12, Plaintiff had yet to see a doctor specializing in his concerns. Plaintiff Malik grieved that by Dr. Balmir and medical staff's failure to act, he was still suffering from neuropathy injuries that caused him severe pain daily; Results: Dr. Balmir concurs that between 3/15/12 and 6/8/12, the Plaintiff saw a doctor 5 times, but never the specialist that he asked to see in his approved grievance. Dr. Balmir also asserts that on each visit his issues were addressed and a plan for treatment was put into place. What Dr. Balmir does not attest to is the same inadequate treatment plan as the previous visit, which left the Plaintiff suffering.

5.   Grievance No.: 1210-401-216; Sent: 10-02-12; Answered: 10-15-12; grieved medical staff's failure to treat Plaintiff's medical needs, stating that all of **his** symptoms have gotten worse. He states that 3 times he was sent to South Florida Reception Center to see a specialist, but each time E.C.I.'s medical staff failed to send his medical record so that the Plaintiff could be treated and consequent to that his diabetes and neuropathy (including pain has gotten worse); Result: denied without addressing the issue of the grievance; By: Dr. Balmir.

6.   Grievance Appeal No.: 12-6-36191; Sent: 11-5-12; Answered: 12-11-12; the Plaintiff wrote two pages appealing the opinion of 1210-401-216;

50

(specifically pain); (sores on feet and legs); Results: once again F.D.O.C.'s response is a denial completely irrelevant to the Plaintiff's appealed complaints involving around the consultation on 10/16/12 with a diabetic specialist and not referring in any way to a neuropathy or Hepatitis-C specialist.

7.   Grievance No.: 1306-401-044; Sent: 6-10-13; Answered: 6-18-12; Emergency grievance grieving neuropathy and diabetes conditions, denial of treatment, pain for over two months without proper medicine; Results: Plaintiff sent his grievance and it was received stamped June 10, 2013; on 6-11-13, he was seen in a Chronic Illness Clinic and the grievance issues were addressed. Consequently to this, his grievance was denied by Balmir.

8.   Grievance No.: 1307-401-242; Sent: 07-30-13; Answered: 08-08-13; Emergency grievance addressing medical staff's depriving him of proper medical treatment: 1) no diabetes insulin in 9 days – dizzy and confused, 2) neuropathy intense pain all day long, 3) aspirin in place of pain medication that he was prescribed and 4) sick call refuses to respond to his listed issues; Result: approved without indication as to what was to be done. (Dr. Balmir)

9.   Grievance No.: 1309-401-148; Sent: 9-19-13; Answered: 10-3-13; 3 page grievance addressing Wexford's ignoring deliberately his ongoing medical

issues which caused them to worsen to the point of being unbearable: failure to respond to documents and orders approved by Dr. Balmir or ARNP Louissaint, severe pain, circulation stockings, and ankle and knee braces; blood pressure needs; ignoring cries for specialist (professional) help; neuropathy injuries (sores) and severe pain; foot and leg ulcers; leg and foot swelling; rashes; numbness; etc.; Result: denied stating that these issues were discussed on 9-19-13; this discussion without action is the very reason for Plaintiff's grievance sent that same day (9-19-13), denied by Dr. Balmir.

10. Grievance No.: 1402-401-050; Sent: 2-3-14; Answered: 2-13-14; grieved specifically the medical treatment by ARNP Louissaint, in which Plaintiff went on sick call twice in regards to swollen feet and pain, where his injuries were disregarded to the extent that no medical treatment was provided; Results: returned without action on the basis that the Plaintiff would be seeing "Mrs. Louissaint soon." Returned by T. Veargis, Admin. Asst. E.C.I.

11. Grievance No.: 1402-401-052; Sent: 2-09-14; Answered: 2-21-14; grieving inadequate medical treatment based on Plaintiff's religious beliefs (Muslim), regarding comments from Balmir, Louissaint and Nurse Rowe for being Muslim and using his religious beliefs as a means to refuse him

medication and medical treatment (especially for severe chronic pain), as well as refusing to give him outside specialist consultations so that his medical conditions can be correctly diagnosed and cared for by an expert, as a means to eliminate his pain and suffering; Result: denied by the person he grieved (Dr. Balmir), because he was prescribed pain medication 10 days after sending grievance; scheduled to see ARNP Louissaint at chronic clinic. (decision appealed # 14-6-07508)

12. Grievance Appeal No.: 14-6-07508; Sent: 2-26-14; Answered: 5-22-14; Plaintiff grieved Dr. Balmir's response to grievance no.: 1402-401-052, in that unlike the response's suggestion of receiving adequate medical treatment, Plaintiff asserts that his medical treatment was so insufficient that it caused him injury, pain, depression, and much mental anguish shown by the many times that he was forced to visit mental health. <u>This is important</u>.

  As with most grievance appeals (which makes most inmates feel that appeals are a waste of time) the Respondent to the appeal is so calloused as to inmates issues that a decision at the institutional level is very seldom (one-in-one hundred or worse) ever overturned, as in the instant case. Instead, the Plaintiff, like almost all other inmate grievers, received the same response: by the records provided to the appellate office (only these

which the medical institution staff wishes to be reviewed [never all your records], your appeal is always denied).

"It is the responsibility of you health care staff to determine the appropriate treatment regimen..." in F.D.O.C., just because you see a physician does not mean that you receive adequate treatment, especially since Dept. of Corr. condones medical cost-saving practices. Appeal denied: Ebony O. Harvey, IISC.

13. Grievance No.: 1403-401-042; Sent: 3-3-14; Answered: 3-20-14; Plaintiff grieved that although he went on sick-call on 02/19/14 and Dr. Balmir prescribed him Ultrom pain medication (when given twice daily, worked in controlling his neuropathy symptoms, especially pain), and it was corroborated as being prescribed , by ARNP Louissaint's assessment of the action for twice daily; that in reality it was prescribed on 02-19-14, and corroborated on 02-20-14, but medical records plainly show that Dr. Balmir's prescription on 02-19/14 was disapproved by Christine for Dr. Reddick, and up through the time of his grievance (3-3-14), the Plaintiff received no pain medication. Results: Dr. Ortega returned the grievance without action citing the bogus ordeal of the prescribed Ultrom that never was received; and then stating the fact that because the Plaintiff went on emergency medical call for pain; and was seen by Dr. Ortega, for

54

Plaintiff's very severe pain (3/17/14 and 3/18/14), and prescribed Naproxin (an over-the-counter pain reliever), his complaint was unfounded, and returned without action. In essence, the grievance was, indeed, founded with the Plaintiff forced to endure pain for a long period of time and then, upon grieving the situation, he was prescribed an inadequate pain reliever (Naproxin), that in comparison to Ultrom is like putting a band-aid on a surgery incision and calling it stitches. The inadequate treatment of Dr. Ortega towards Plaintiff's severe pain was no more than whitewashing a bad situation to seem adequate, when in essence, it was like no treatment at all, because of Dr. Ortega's response to this grievance the Plaintiff suffered even more from pain.

14. Grievance No.: 1403-401-158; Sent: 3-18-14; Answered: 4-3-14; Plaintiff grieves the fact that on 2-19-14, before Dr. Balmir prescribed him the disapproved Ultrom; he saw Nurse Jenin Hill and discussed the situation with her in her medical staff office and was assured by her that all of his medical problems would be taken care of, but they weren't; Result: the grievance was answered by T. Veargis that the Plaintiff would soon be seen by Ms. Hill (approved).

15. Grievance No.: 1405-401-177; Sent: 5-14-14; Answered: 5-16-14; grieving the same medical conditions of medical injuries and pain from as far back

as February 3, 2014 and the fact that his treatment has been so inadequate, so as to constitute no treatment at all. Result: approved – will see provider soon.

16. Grievance No.: 1405-401-234; Sent: 5-20-14; Answered: 5-23-14; grieving ARNP Louissaint's actions in his behalf being so bad as to cause his sicknesses and pain to get so worse and so severe (respectively) that he can no longer focus on "anything, anymore." Result: returned denied (by unidentified script), because he was seen the day the grievance was responded to, and his problems were said to be taken care of, Plaintiff received Ultrom twice daily for 30 days.

17. Grievance No.: 1407-401-117; Sent: 7-21-14; Answered: 8-7-14; grieved actions of Nurse Ricky Rowe's inadequate medical treatment dealing with pain and chest cold. Result: denied.

18. Grievance No.: 1407-401-127; Sent: 7-21-14; Answered: 8-7-14; Plaintiff grieved the fact that for five years, from when he was diagnosed as having Hepatitis-C in 2009, he had not been treated in any way for the serious medical needs involving the disease, which he complains have already caused a medical breakdown of his body deteriorating. Plaintiff simply asks for Hepatitis treatment with the proper medication. Results: Dr.

Gaxiola denied him Hepatitis treatment saying that soon he would be seen in a Chronic Illness Clinic and to raise the issue then.

19. Grievance No.: 1408-401-070; Sent: 08-21-14; Answered: 09-02-14; grieving that pm 08-18-14, he was seen by Dr. Ortega during his Chronic Illness Clinic, where he brought up the issues of his leg and feet swelling, widespread body rashes and concerns about Hepatitis-C. Plaintiff grieves that none of these conditions were treated and quoted Dr. Ortega as saying that Hepatitis-C is not ever treated at E.C.I., and that any assertion by anyone that the Plaintiff had received "Hep C" treatment in the past was erroneous. Plaintiff simply asks to be seen by a physician to address his chronic swelling, rashes and Hepatitis-C disease that Dr. Ortega refused to treat; Results: denied by Dr. Gaxiola.

20. Grievance No.: 1409-401-075; Sent: 9-18-14; Answered: 9-26-14; grieves the fact that the Plaintiff saw Dr. Ortega in consultation about his many medical conditions on September 2, 2014 and in the outcome of the visit, the Plaintiff was allowed to give the doctor a card expressing his concerns in which Dr. Ortega said he would respond in writing and return to the Plaintiff. The questions were those which Dr. Ortega did not have time to answer or that he did not have time to answer in their entirety, such as BUN/Creatinine levels, AST.ALT levels, skin lesions, pain management

and treatment plan for his Hepatitis-C disease; none of which was ever done and the Plaintiff grieved. Dr. Ortega's prognosis was supposed to lead to a knowledgeable treatment plan for Plaintiff's many medical conditions, overriding any, then, existing determinations, and new medication for HCV+ was to be prescribed. It never happened. Result: the grievance was denied by Dr. Gaxiola.

21. On September 25, 2014, as a failsafe of his many medical concerns that were never adequately addressed or cared for by E.C.I.'s medical staff, FDOC, or the Warden of Everglades C.I., the Plaintiff lettered the Regional Medical Director (employed by Wexford and an agent of FDOC), Dr. Reddick about his deteriorating condition, and even moreso, the lacking of adequate medical treatment. Result: the letter was never responded to.

(These are Plaintiff's Top 21 Grievances and Responses)

## VIII. Previous Lawsuits

A. To the best of his knowledge, the Plaintiff states that he has not had a case dismissed based on the "Three Strike Rule."

B. Plaintiff has not filed other lawsuits in state or federal court dealing with the same facts involved in this action.

C. The Plaintiff has filed no other lawsuits in state or federal court otherwise relating to the conditions of his imprisonment.

## IX.  Certification and Closing

A. Date of Signing: ___8- 25-___, 2016

Signature of Plaintiff: _____

Printed name of Plaintiff: Najib Malik

Prison Identification #: X41699

Prison address: Santa Rosa Correctional Institution
5850 East Milton Road
Milton, Florida 32583-7914

B. **Unnotarized Oath**

I **DECLARE UNDER THE PENALTY OF PERJURY**, that the foregoing amended complaint is true and correct.

Executed: ___8- 25___, 2016          /s/ _____

Najib Malik X41699

## CERTIFCATE OF SERVICE

I CERTIFY THAT A TRUE AND CORRECT COPY OF
THE FOREGOING FINAL AMENDED COMPLAINT HAS BEEN
PLACED IN THE HAND OF LEGAL MAIL OFFICIALS FOR MAILING
WITH PREPAID FIRST CLASS POSTAGE THIS 25TH DAY OF
AUGUST, 2016! TO: UNITED STATE DISTRICT COURT,
SOUTHERN DISTRICT COURT OF FLORIDA, CLERK OF COURT,
400 NORTH MIAMI AVENUE, ROOM 8N09, MIAMI, FLORIDA
33128-7716

59          CERTIFIER: NAJIB MALIK

X _____ X41699

/ Legal Mail

NAJIB MALIK X441699
SANTA ROSA CORRECTIONAL INSTITUTION
ANNEX
5850 EAST MILTON ROAD
MILTON, FLORIDA 32583-7914

LEGAL MAIL

CASE NO.: 14-23204-CIV-LENARD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CLERK OF COURTS ROOM 9NO9
400 NORTH MIAMI AVENUE
MIAMI, FLORIDA 33128-7716



PENSACOLA FL 325
FRI 26 AUG 2016 PM

PROVIDED TO

MAILED FROM
A STATE CORRECTIONAL
INSTITUTION

